**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

─────────────

**No. 22-1322**

─────────────

TIGER CELA,

                     Petitioner,

       v.

MERRICK B. GARLAND, Attorney General,

                     Respondent.

─────────────

On Petition for Review of an Order of the Board of Immigration Appeals.

─────────────

Argued:  March 7, 2023                              Decided:  July 28, 2023

─────────────

Before AGEE, HARRIS, and QUATTLEBAUM, Circuit Judges.

─────────────

Petition for review denied by published opinion. Judge Quattlebaum wrote the opinion in which Judge Agee joined. Judge Harris wrote an opinion concurring in part and dissenting in part.

─────────────

**ARGUED:** Benjamin Ross Winograd, IMMIGRANT & REFUGEE APPELLATE CENTER, LLC, Alexandria, Virginia, for Petitioner. Michelle R. Slack, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:** Raymond Reza Bolourtchi, COFMAN & BOLOURTCHI LLC, St. Louis, Missouri, for Petitioner. Brian Boynton, Principal Deputy Assistant Attorney General, Justin Markel, Senior Litigation Counsel, Office of Immigration Litigation, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

─────────────

QUATTLEBAUM, Circuit Judge:

Subject to other requirements, the Attorney General "may adjust to the status of an alien lawfully admitted for permanent residence the status of any alien granted asylum[]." 8 U.S.C. § 1159(b). The question presented here is whether the prior termination of an alien's asylum status renders the alien ineligible for this adjustment. Based on the text of § 1159(b), the answer is yes. So, we affirm the Board of Immigration Appeals ("BIA") and deny the petition before us.

I.

Tiger Cela, a native and citizen of Albania, entered the United States in 2001. He remained in the country until 2008, when he was ordered removed. Between 2008 and 2012, he lived in Albania. Then, he returned to the United States and was granted asylum— derivative of his father's asylum application. *See* 8 U.S.C. § 1158(b)(3).

In 2015, Cela was charged with federal bank fraud and aggravated identity theft. In 2016, he was convicted of those charges after pleading guilty and sentenced to 44 months in prison. Based on Cela's convictions, in August 2019, the Department of Homeland

Security ("DHS") began removal proceedings against Cela.[1] And also because of those convictions, in September 2019, DHS moved to terminate his asylum status.[2]

The immigration judge ("IJ") granted DHS's motion to terminate Cela's asylum status in September 2019. The IJ held a hearing on DHS's removal proceedings against Cela in October 2019. In connection with that hearing, Cela conceded he was removable based on the bank fraud and identity theft proceedings but requested the IJ waive those grounds for his removal. Cela also applied to adjust his status to lawful permanent resident.[3] And he separately sought withholding of removal and protection under the Convention Against Torture ("CAT").

The IJ denied Cela's request for a waiver. The judge also concluded that Cela was ineligible for adjustment of status because his asylee status had already been terminated. The IJ also denied Cela's requests for withholding and protection under CAT. Finally, the IJ ordered Cela be removed to Albania.

Cela appealed that decision to the BIA which, in a published decision before a three-judge panel, dismissed the appeal and affirmed the IJ's denial of relief. *Matter of T-C-A-,*

---

[1] Under 8 U.S.C. § 1227(a)(2)(A)(iii), a noncitizen convicted of an aggravated felony involving fraud or deceit with a loss to the victim or victims of $10,000 or more, as defined by 8 U.S.C. § 1101(a)(43)(M)(i), is removable from the United States.

[2] Under 8 U.S.C. § 1158 (c)(2), the Attorney General may terminate asylum granted for various reasons, including the alien's conviction for a "particularly serious crime." *See* 8 U.S.C. §§ 1158 (b)(2)(A)(ii), (c)(2).

[3] This was actually Cela's second application for adjustment. He applied first in 2012, soon after he returned to the United States. That application was denied although the record contains no details about when or why.

3

28 I&N Dec. 472 (BIA 2022). In addressing whether the termination of Cela's asylum status rendered him ineligible to adjust to lawful permanent resident, the BIA first concluded that the text and legislative history of 8 U.S.C. § 1159(b) "do not reveal whether Congress clearly intended adjustment of status under this provision to be available to respondents whose asylee status has been terminated." A.R. 24. And it concluded that the phrase "the status of any alien granted asylum" could be interpreted in different ways. A.R. 24. For example, it said the phrase could mean an applicant is eligible for adjustment only if he or she presently maintains asylee status. Or, it continued, the phrase could mean that "an applicant is eligible for adjustment if, at any time in the past, he or she was granted asylum, regardless of whether that applicant currently maintains asylee status." A.R. 24. Finding ambiguity, the BIA determined that it had to develop a reasonable statutory interpretation based on the directives from *Chevron, U.S.A., Inc. v. National Resources Defense Council, Inc.*, 467 U.S. 837, 842–44 (1984).

The BIA then interpreted § 1159(b) to require an applicant to possess a current "status" before an alien could seek to adjust that status to lawful permanent resident status. A.R. 27. And since Cela's status as an asylee had been terminated prior to his application for adjustment of status, the BIA reasoned, Cela was ineligible to adjust to a different status. The BIA also affirmed the IJ's determination that Cela was statutorily ineligible for withholding of removal based on his conviction, as well as the IJ's denial of withholding and CAT relief.

But the BIA's decision was divided. One panel member disagreed with the majority's conclusion that, under § 1159(b), the termination of asylee status bars an alien

from applying for adjustment of status. The dissenting judge found that the statutory language unambiguously establishes that an asylee may pursue adjustment of status even if his asylum status had previously been terminated. That judge felt the appropriate resolution was to remand to the IJ so that Cela could apply for adjustment and the IJ could consider the merits of the application.[4]

Cela timely petitioned for review of the BIA's decision. We have jurisdiction to review pursuant to 8 U.S.C. § 1252(b)(1).[5]

## II.

Cela asks us to grant his petition for review and vacate the BIA's decision determining that the termination of his asylum status renders him ineligible to seek adjustment of status to lawful permanent resident under § 1159(b).[6] Granting that relief would mean Cela's application for adjustment of status could proceed, allowing the IJ to

---

[4] The judge concurred with all other aspects of the majority's decision.

[5] We have sole and exclusive jurisdiction to review an order of removal. 8 U.S.C. § 1252(a)(5). We have no jurisdiction to review "any final order of removal against an alien who is removable by reason of having committed a criminal offense covered in section 1182(a)(2) or 1227(a)(2)(A)(iii), (B), (C), or (D) of this title, or any offense covered by section 1227(a)(2)(A)(ii)." 8 U.S.C. § 1252(a)(2)(C). But we may review constitutional claims or questions of law. 8 U.S.C. § 1252(a)(2)(D).

[6] Cela does not challenge either his removability or the BIA's determination that he does not qualify for withholding of removal or CAT relief. Petitioner's Br. at 42. But Cela voluntarily complied with the order of removal and returned to Albania after the filing of the petition. Petitioner's Br. at 40. And for that reason, Cela asks that if we grant his petition for review, we order the government to facilitate his return to this country.

then consider his request for discretionary relief under 8 U.S.C. § 1159(b) and (c). Petitioner's Br. at 25; 46.

A.

Before we reach the merits of Cela's petition, we must consider a threshold issue. The Attorney General argues that Cela's petition is moot because he returned to Albania. Section 1159(b)(3) requires an alien seeking adjustment of status to "continue[] to be a refugee within the meaning of section 1101(a)(42)(A)," which requires the alien to remain outside his native country.

According to the Attorney General, since Cela has not remained in the United States, Cela's application is futile and thus his petition is moot. In response, Cela points out that § 1159(b)(3) permits a "child of [] a refugee" to qualify for adjustment of status. And since he was granted asylum derivative of his father's asylum application, he argues that provision allows him to seek adjustment even though he is now over 21 years old. And alternatively, he claims that we could cure any problem caused by his return to Albania by granting him the effectual relief of ordering the government to facilitate his return to the United States.

Principles of mootness relate to Article III's limitation on the jurisdiction of federal courts to cases and controversies. U.S. Const. art. III, § 2, cl. 1. Cases that are moot are not cases and controversies. *Eden, LLC v. Justice*, 36 F.4th 166, 169–70 (4th Cir. 2022). A case becomes moot when it is impossible for a court to grant any "effectual relief" to the prevailing party. *Knox v. Serv. Emps. Int'l Union, Loc. 1000*, 567 U.S. 298, 307–08 (2012) (internal citation and quotation marks omitted). But as long "as the parties have a concrete

6

interest, however small, in the outcome of the litigation, the case is not moot." *Ellis v. Bhd. of Ry., Airline & S.S. Clerks, Freight Handlers, Exp. & Station Emps.*, 466 U.S. 435, 442 (1984).

The Attorney General's argument that Cela's return to Albania renders him ineligible to adjust his status under § 1159(b)(3) might provide an alternative basis for denying Cela's application on the merits. But it does not mean Cela's petition is moot for the purposes of Article III.[7]  In this petition, Cela asks us to vacate the BIA's decision interpreting § 1159(b) to mean he is ineligible for adjustment so that the IJ can consider his application for adjustment of status on the merits. And we have the power to grant that relief. *See Church of Scientology of California v. United States*, 506 U.S. 9, 12–13 (1992) ("While a court may not be able to return the parties to the *status quo ante* . . . a court can fashion *some* form of meaningful relief in circumstances such as these."). So, Cela's petition presents a live controversy permitting us to proceed to the merits.

## B.

In addressing this petition, we consider whether an alien whose asylum status has been terminated may apply to adjust his status to lawful permanent resident. Considering "the status of any alien granted asylum" language in § 1159(b), the BIA concluded that such an alien is not eligible to apply for an adjustment. We review the BIA's legal

---

[7] And since we deny the petition on the merits based on our interpretation of § 1159(b)'s "status of any alien granted asylum" language, as noted below, we do not address the merits of whether Cela's return to Albania is an alternate ground to deny the petition.

conclusions, including those regarding statutory construction, de novo. *Leiba v. Holder*, 699 F.3d 346, 348 (4th Cir. 2012).

But we "also grant appropriate deference to the Board's interpretation of the [Immigration and Nationality Act] under the two-step framework set out in *Chevron*." *Id.*[8]

While perhaps controversial, *Chevron*'s two-step framework is well-settled. When a court reviews an agency's construction of the statute which it administers, the Court first considers "whether Congress has directly spoken to the precise question at issue." *Chevron*, 467 U.S. at 842. But if the reviewing court determines that "Congress has not directly addressed the precise question at issue, . . . the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843; *see also Hui Zheng v. Holder,* 562 F.3d 647, 654 (4th Cir. 2009) (explaining that under C*hevron*, courts afford the BIA the "deference that must be given to agency interpretations of their own governing statutes"). If "the statute is silent or ambiguous, we defer to the agency's interpretation if it is reasonable." *Midi v. Holder*, 566 F.3d 132, 137 (4th Cir. 2009). The Supreme Court, however, has recently cautioned against rushing to the ambiguity conclusion. Courts must exhaust "all the 'traditional tools' of construction," emptying our interpretive toolboxes by considering the "text, structure, history, and purpose" of a statute

---

[8] We do not even apply the *Chevron* analysis unless Congress has "delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." *United States v. Mead Corp.*, 533 U.S. 218, 226–27 (2001). "The Immigration and Nationality Act is a civil statute that expressly delegates rulemaking authority to the agency in a civil proceeding." *Pugin v. Garland*, 19 F.4th 437, 442 (4th Cir. 2021).

and to look to the agency only if the statute is "genuinely ambiguous." *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019). "[O]nly when [the] legal toolkit is empty and the interpretive question still has no single right answer can a judge conclude" that deference is appropriate. *Id.* "That means a court cannot wave the ambiguity flag just because it found the [statute] impenetrable on first read." *Id.*

C.

So with our toolbox in hand, we turn to whether aliens whose asylum status has been terminated are ineligible for adjustment of status to lawful permanent resident under § 1159(b). For background, § 1158 describes asylum as a form of discretionary protection against removal available to aliens who are physically present in the United States—legally or illegally—or who arrive in the United States—whether or not at a designated port of arrival. 8 U.S.C. § 1158(a)(1). To qualify for asylum, an alien must establish that the applicant is a "refugee" as defined by 8 U.S.C. § 1101(a)(42)(A). That means the alien has the burden of showing that he is outside his country of nationality and that his "race, religion, nationality, membership in a particular social group, or political opinion was or will be at least one central reason for persecuting the applicant [if returned to his or her native country]." 8 U.S.C. § 1158(b)(1)(B)(i); *see also* 8 U.S.C. § 1101(a)(42)(A).

 If granted, asylum status can be terminated if the Attorney General determines that the alien no longer qualifies for protection due to a fundamental change in circumstances impacting eligibility; the alien was convicted by a final judgment of a "particularly serious crime" or other dangerous criminal activity; the alien has been removed pursuant to an agreement to a country other than his native country and is eligible to receive asylum

9

protection there; the alien has availed himself of his own country of nationality by returning there; or the alien has acquired a new nationality. *See* 8 U.S.C. § 1158(c)(2).

Under § 1159(b), aliens granted asylum can seek adjustment of status to lawful permanent resident.[9] That subsection lists five requirements for adjustment. But before those requirements, the subsection contains preliminary language relevant here:

> The Secretary of Homeland Security or the Attorney General, in the Secretary's or the Attorney General's discretion and under such regulations as the Secretary or the Attorney General may prescribe, *may adjust to the status of an alien lawfully admitted for permanent residence the status of any alien granted asylum* who--

8 U.S.C. § 1159(b) (emphasis added).

Both parties suggest that the statute unambiguously supports their interpretation. To summarize the arguments, Cela argues that Congress used the word "granted" in the "status of any alien granted asylum" language as a past tense verb. So, he argues the statute only requires that the alien once be granted asylum status, which he was.

---

[9] Under § 1159(a), aliens admitted into the United States under 8 U.S.C. § 1157 as refugees can also seek adjustment of status to lawful permanent resident. Unlike aliens granted asylum—who are physically present in the United States or arrive in the United States when they seek asylum—aliens admitted as refugees seek admission to the United States from foreign countries. *See I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 433 (1987). As a general matter, the President may designate the number of refugees who may be admitted into the United States from foreign countries each year based on humanitarian concerns and national interests. 8 U.S.C. § 1157(a). Subject to those numerical limitations, the Attorney General, in his or her discretion, may admit refugees determined to be of special humanitarian concern to the United States. 8 U.S.C. § 1157(c)(1). But they must also meet the definition of refugee from § 1101(a)(42). The Attorney General may terminate "the refugee status of any alien" if the alien was not in fact a refugee within the meaning of § 1101(a)(42) at the time the alien was admitted. *See* 8 U.S.C. § 1157(c)(4). Section 1159(a) provides the requirements and procedures for those aliens to adjust to lawful permanent resident status.

Similarly, Cela points out that the provisions of § 1159(b) do not impose an express requirement that the asylum status has not been terminated. In contrast, he explains that § 1159(a) contains such an express non-termination requirement for refugees. As a result, Cela argues that Congress's intentional omission of a non-termination requirement for asylees means aliens whose asylum status has been terminated may apply to adjust their status to lawful permanent resident.

Cela also points to a note in the legislative history of 8 U.S.C. § 1159—enacted in Section 104(d) of the Immigration Act of 1990. The Immigration Act of 1990 increased the numerical limit on asylee adjustments and exempted certain noncitizens from the cap altogether. In addressing the numerical limit, the legislative note provided that § 1159(b) applies to an alien "who was granted asylum before the date of the enactment of this Act (regardless of whether or not such asylum has been terminated under section 208(b) of the Immigration and Nationality Act)." IMMIGRATION ACT OF 1990, Pub. L. No. 101–649, 104 Stat. 4978, 4985. This note, Cela argues, supports his interpretation of § 1159(b).

And Cela relies on the Fifth Circuit's decision in *Siwe v. Holder*, 742 F.3d 603 (5th Cir. 2014). In that case, a native and citizen of Cameroon was granted asylum. *Id.* at 604. Years later, the government began removal proceedings due to his criminal convictions. Before the IJ, Siwe argued that he should not be removed because he was entitled to adjust his status from asylee to lawful permanent resident. The IJ rejected his argument and denied his request for relief from removal. *Id.* The BIA affirmed. Then, in granting Siwe's petition in part, the Fifth Circuit held that the plain language of § 1159(b) does not expressly require an alien to maintain asylum status to apply for an adjustment of status. *Id.*

11

The Attorney General disagrees. In doing so, the Attorney General focuses on the word "status." He notes that courts are to normally interpret the words and phrases of a statute according to their ordinary public meaning at the time of the statute's enactment. *See Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1738 (2020). Here, Congress initially enacted 8 U.S.C. § 1159 as part of the Refugee Act of 1980, Pub. L. No. 96-212, § 209, 94 Stat. 102, 105–06. And the Attorney General cites dictionaries indicating that in 1980, the word "status" meant a person's legal standing, "state or condition." *Status*, *Black's Law Dictionary* (5th ed. 1979). In other words, "the condition of a person or thing in the eyes of the law." *Status*, *Webster's New Collegiate Dictionary* (1977). According to the Attorney General, those dictionary definitions indicate that "status" refers to one's current or present position. Following that logic, the Attorney General argues that Cela did not have any status at the time of his application for change of status and thus was not eligible for adjustment.

Further, the Attorney General argues Cela's position reads the word "status" out of the phrase "status of any alien granted asylum." According to the Attorney General, under Cela's interpretation, "of any alien granted asylum" has the same meaning as "status of any alien granted asylum." As a result, the word "status" becomes surplusage. The Attorney General urges that we follow the canon that a statute should be interpreted to give effect to every word of the statutory provision. *See Freytag* v. *Comm'r*, 501 U.S. 868, 877 (1991) (expressing "a deep reluctance to interpret a statutory provision so as to render superfluous other provisions in the same enactment" (citation omitted)).

The Attorney General also points to another provision in the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1255(i), where Congress did not require an initial status for aliens to adjust their status to lawfully admitted for permanent residence, but instead began with a factual condition, "an alien physically present in the United States." To the Attorney General, that shows Congress knew how to omit a status requirement when it wanted to, meaning that including the word "status" in § 1159(b) imposed a requirement for an alien to have a current status to be eligible to apply for an adjustment. *See generally Cardoza-Fonseca,* 480 U.S. at 432 ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (alteration in original) (citation omitted)).

And the word "status," according to the Attorney General, read alongside "granted asylum" in § 1159(b), also reflects a view of a party's present state. The Supreme Court has held that "past participles like 'owed' are routinely used as adjectives to describe the present state of a thing." *Henson v. Santander Consumer USA Inc.*, 137 S. Ct. 1718, 1720 (2017).

D.

This is not the first time we have grappled with the meaning of § 1159(b). In *Mahmood v. Sessions*, 849 F.3d 187 (4th Cir. 2017), we addressed that subsection in a slightly different but analogous context. There, an alien who was granted asylum successfully adjusted his status to lawful permanent resident. *Id.* at 188. An immigration judge then found that he had committed immigration fraud and ordered his removal and

13

the BIA affirmed. *Id.* The alien then petitioned for our review, arguing that despite his prior adjustment to lawful permanent resident, he had "continuing status as an asylee." *Id.* at 190. And based on that continuing status, the alien argued he was entitled to all the protections of an asylee until that status was terminated, regardless of whether the asylee had adjusted his status to lawful permanent resident. *Id.* at 190–91.

In response to those arguments, we observed that § 1159(b) contemplates two statuses—an "alien granted asylum" and an "alien lawfully admitted for permanent residence" and "describes a process of 'adjustment' from the former 'to' the latter." *Id.* at 191. We added that the alien's reading of the INA "is not the best one," but "it is at least plausible, thus suggesting ambiguity" with respect to § 1159(b). *Id.* at 193. And "[u]nder the assumption that § 1159(b) is indeed ambiguous, it then becomes appropriate to defer to the BIA's interpretation of [§ 1159(b)] in resolving the issue." *Id.*

But since our decision in *Mahmood*, the Supreme Court has admonished that we do not waive the ambiguity flag too quickly. *Kisor*, 139 S.Ct. at 2415. Instead, we must utilize all our interpretive tools to discern a statute's meaning. Doing that, we reject Cela's interpretation of § 1159(b). His best argument is the absence of a non-termination requirement in § 1159(b) in comparison to the presence of one in § 1159(a).[10] And it is true

---

[10] The dissent makes this point. It also contends § 1159(b)(3)'s "continues to be a refugee" and § 1159(b)(5)'s "at the time of examination for adjustment" language shows that Congress knew how to be clear on timing when it wanted to and that absence of clear language in § 1159's threshold eligibility language indicates an alien who was once an asylee but no longer is remains eligible for adjustment to lawful permanent resident status. We disagree. That language simply means that in § 1159, Congress emphasized timing in several different ways and maybe was not perfectly consistent in doing so. Arguably, it did

14

that neighboring provisions can be useful in interpreting statutes. A. Scalia & B. Garner,

*Reading Law: The Interpretation of Legal Texts*, 167, 195 (2012). But the words in the

actual provision at issue—§ 1159(b)—overcome that argument. Our starting point in

questions of statutory construction is the language of the statute itself and "where the

statutory language provides a clear answer, it ends there as well." *Hughes Aircraft Co. v.

Jacobson*, 525 U.S. 432, 438 (1999). In particular, we are persuaded by the words "status"

and "adjust." We agree with the Attorney General that the ordinary meaning of "status"

signals a present condition. *Mahmood*, 849 F.3d at 193; *see also Status*, *Black's Law

Dictionary* (5th ed. 1979). In fact, without that meaning, the phrase "the status of" in

§ 1159(b) does no work.

The same with the word "adjust." As we explained in *Mahmood*, adjust suggests a

move from one current status to another. 849 F.3d at 191. And since Cela had no asylum

status at the time he applied to become a lawful permanent resident, he had nothing from

---

so with more clarity in some provisions compared to others. But the fact that some language
in § 1159 might be more emphatic about timing should not cause us to cast aside
§ 1159(b)'s threshold eligibility language. Section 1159(b)'s "may adjust to the status of
an alien lawfully admitted for permanent residence the status of any alien granted asylum"
language is unambiguous. It renders an alien whose asylum status has been terminated
ineligible for adjustment.

Likewise, we see no inconsistency in § 1159(c) and our interpretation of the statute's
threshold eligibility language. True, if an alien's asylee status is terminated due to certain
criminal convictions, the agency might not be able to exercise the discretion § 1159(c)
gives it to waive certain grounds of inadmissibility for humanitarian and other reasons. But
that does not render § 1159(c) inoperative or surplusage. Some asylees would still need to
seek a waiver under § 1159(c) to adjust status. And further, as the BIA pointed out, an IJ
could elect to defer ruling on a motion to terminate asylee status pending consideration of
an application for adjustment under § 1159(b).

which he could adjust. It is hard to understand how an alien can adjust his or her status without a cognizable status in the first place. Thus, Congress's use of "adjust" suggests a requirement of an existing status. In fact, were that not the case, Congress would have used verbs such as apply, petition or request instead of adjust.

For these reasons, we conclude that § 1159(b) unambiguously precludes an alien whose asylum status has been terminated from adjusting to lawful permanent resident status. On that basis, Cela's argument fails at step one of the *Chevron* test. Since Cela's asylum status had been terminated at the time he sought to adjust to lawful permanent resident status, he was not eligible for that adjustment. *See Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000) (noting that when "the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms") (cleaned up).[11]

### E.

Even if we were to proceed to step two, Cela would fare no better. *Chevron* requires us to afford deference to the BIA's reasonable interpretation. *Lizama v. Holder*, 629 F.3d 440, 446–47 (4th Cir. 2011) (holding that if neither the relevant statutes or associated regulations specifically define a term, courts defer to the "BIA's reasonable interpretation of the term"); *Martinez v. Holder*, 740 F.3d 902, 909–10 (4th Cir. 2014) ("When issuing a

---

[11] Although the Fifth Circuit reached a different conclusion in *Siwe*, that decision predated the Supreme Court's decision in *Henson*. Therefore, the Fifth Circuit did not have the benefit of the *Henson* court's explanation that a past participle—such as "granted" in § 1159(b)—can be used as a past-tense verb *or* as an adjective describing a present state. *See* 137 S. Ct. at 1722.

16

single-member, nonprecedential opinion, the BIA is not exercising its authority to make a rule carrying the force of law, and thus the opinion is not entitled to *Chevron* deference."); *Hernandez v. Holder*, 783 F.3d 189, 192 (4th Cir. 2015) ("But in doing so, we give the BIA *Chevron* deference so long as its decision is a precedential decision issued by a three-judge panel."). So, in the end, our question is whether the BIA's conclusion in *Matter of T-C-A-*, 28 I&N Dec. 472 (BIA 2022), that "the status of any alien granted asylum" means an alien whose asylum status has been previously terminated is ineligible, is reasonable. And we would have no trouble concluding that the BIA's interpretation of § 1159(b), if not correct, is at least reasonable. And deferring to the BIA's interpretation, we would also conclude that, at the time he applied to adjust to lawful permanent resident status, Cela no longer held the status of "alien granted asylum" from which he could adjust. Therefore, he was not eligible to adjust to lawful permanent resident status.

III.

For the forgoing reasons, the petition for review is

*DENIED.*

17

PAMELA HARRIS, Circuit Judge, concurring in part and dissenting in part:

I agree with the majority that this case is not moot and am pleased to join that portion of the court's opinion. But I part ways with the majority when it comes to the best interpretation of 8 U.S.C. § 1159(b). Like the Fifth Circuit – the only other federal court of appeals to have addressed the issue – I read the statute to allow a noncitizen whose asylum has been terminated to apply for adjustment of status. *See Siwe v. Holder*, 742 F.3d 603 (5th Cir. 2014).

To be sure, § 1159(b) is not a model of clarity, and I find this to be a difficult question of statutory construction – as reflected in the divergent views of the BIA panel that heard Cela's case, *see* A.R. 33–40 (Liebmann, dissenting in part), and the disagreement on this panel. But as the majority explains, it is our job to find our way to the best reading of even an initially "impenetrable" statutory provision, using every available tool of construction. *See Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019). And here, the "traditional tools of statutory construction" lead me to the conclusion that Congress did not intend to limit eligibility for adjustment of status under § 1159(b) to current asylees. *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 n.9 (1984) ("If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect.").

The provision in question, recall, allows the relevant agency head, at his discretion, to "adjust to the status of an alien lawfully admitted for permanent residence" – or "LPR" – the "status of *any alien granted asylum*." 8 U.S.C. § 1159(b) (emphasis added). And the question in this case is whether that language covers a noncitizen once "granted asylum,"

18

past tense, whose asylum is later terminated – like Cela – or whether it reaches only noncitizens who are still asylees when they apply for adjustment.  There is a case to be made that the phrase "any alien granted asylum," standing alone, answers that question in favor of eligibility.  As the dissenting judge on the BIA explained, the term "'any alien granted asylum' is not synonymous with the term 'asylee,'" which Congress would be expected to use had it intended to require *current* asylum status.  A.R. 33.  And there is nothing else about the phrase "any alien granted asylum" that signals congressional intent to "require that an alien's asylum, once granted, still must be in effect at the time he applies for adjustment of status."  *Siwe*, 742 F.3d at 608.

But I am prepared to assume, like the Fifth Circuit, that the term "any alien granted asylum," standing alone, does not clearly answer the question before us.  *See id.*  And unlike the majority, I do not think it helps much to expand the frame slightly and consider the agency's discretion to adjust "the *status* of any alien granted asylum":  The "status" Congress is referring to here seems to be *non-LPR status*, which may be adjusted, with the approval of the Attorney General or Secretary, to *LPR status*.  *See* 8 U.S.C. § 1159(b) (agency head may "adjust to the *status* of an alien lawfully admitted for permanent residence the *status* of any alien granted asylum" (emphasis added)).  And even if "status" refers to a noncitizen's status vis-à-vis asylum, to my eyes we are left with basically the same question:  Is the requisite asylum status that of a noncitizen "granted asylum" in the past, even if later terminated, or that of a noncitizen who is currently "granted asylum" when he applies for adjustment?  *See* A.R. 34 & n.2 (Liebmann, dissenting in part).

Fortunately, of course, the phrase in question does not stand alone; it is part of a broader statutory context. So in assessing the "plainness or ambiguity" of "any alien granted asylum" we look not only to the "language itself," but also to "the specific context in which that language is used, and the broader context of the statute as a whole." *Yates v. United States*, 574 U.S. 528, 537 (2015) (internal quotation marks omitted). And here, in my view, two features of the statutory context make clear that the term "any alien granted asylum," as used in § 1159(b), is not limited to current or continued asylee status.

First and most important is the fact that when Congress intended to impose a continuing-status requirement in § 1159, it did so expressly and unambiguously. As the majority recognizes, § 1159(a) – a parallel provision to § 1159(b), covering adjustment of status for noncitizens admitted as refugees – includes the very non-termination requirement that is conspicuously missing from § 1159(b). *See* 8 U.S.C. § 1159(a)(1)(A) (limiting eligibility to noncitizens admitted as refugees "whose admission has not been terminated"). And that is not all: Twice within § 1159(b) *itself* Congress wrote in an unmistakable continuing-status requirement, first in § 1159(b)(3), which limits eligibility to an "alien granted asylum" who "*continues to be a refugee*" within the relevant statutory definition, and second in § 1159(b)(5), which requires that an "alien granted asylum" be admissible as an immigrant "*at the time of examination*" of an application for adjustment. *See* 8 U.S.C. § 1159(b)(3), (5) (emphasis added). This was not just a Congress that knew how to say – if it wanted to – that a noncitizen once granted asylum would remain eligible for adjustment only if he "continue[d] to be" an asylee, *cf.* § 1159(b)(3), or if he was an asylee "at the time of examination for adjustment of status," *cf.* § 1159(b)(5). This was a Congress downright

preoccupied with the timing question in front of us now, and against that background, its failure to specify that asylee status must be current under § 1159(b) can only be understood as a purposeful omission. *See Siwe*, 742 F.3d at 608–09.

I think these surrounding provisions are enough to make plain the meaning of "any alien granted asylum" as used in § 1159(b). *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 466 (2001) (instructing that especially when words "can have more than one meaning," courts must be attentive to "their surroundings"). But if more were required, I would find it in the intersection of § 1159(b)'s threshold eligibility requirement with § 1159(c)'s waiver provision. *See Abramski v. United States*, 573 U.S. 169, 179 n.6 (2014) (reminding courts to "look at [a] word's function within the broader statutory context").

As noted above, § 1159(b)(5) requires that a noncitizen be admissible before his status may be adjusted, and here, the same criminal convictions that led to the termination of Cela's asylum also rendered him inadmissible. *See* A.R. 34 (Liebmann, dissenting in part). But under § 1159(c), the agency head may waive those bars to admissibility, in his discretion, "for humanitarian purposes, to assure family unity, or when it is otherwise in the public interest." 8 U.S.C. § 1159(c). So on the majority's reading, Cela's criminal convictions exclude him from eligibility for adjustment of status (because he is no longer an asylee under § 1159(b)), even though Congress specified that those convictions need *not* exclude him from eligibility (because they may be waived under § 1159(c)). It may be too much to say that this interpretation renders § 1159(c)'s waiver provisions surplusage, *cf.* A.R. 35 (Liebmann, dissenting in part), but it is surely an odd result. And it has the effect of undermining the discretion that Congress clearly sought to vest in the agency head

21

under § 1159(c).  *See Siwe*, 742 F.3d at 609 ("The government's proposed [] interpretation – that any alien whose asylum has been terminated is barred *ipso facto* from applying for adjustment of status – would effectively abrogate Congress's careful balancing of interests, as codified in [§ 1159(c)].").

For these reasons, and following the lead of the Fifth Circuit, I would hold that § 1159(b), construed with the aid of our traditional tools, does not exclude from eligibility noncitizens once granted asylum whose asylum has been terminated.  Because the majority takes a different view, I respectfully dissent from that portion of its opinion.